STATE OF NEBRASKA, APPELLEE, V. TOM RAY HOPPES, APPELLANT.

275 N. W. 2d 608

Filed February 20, 1979. No. 42065.

Paul E. Watts, Gerald E. Moran, Robert C. Sigler, and Julianne M. Dunn, for appellant.

Paul L. Douglas, Attorney General, and Robert F. Bartle, for appellee.

Heard before KRIVOSHA, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

SPENCER, J.

This is an appeal from a denial of post conviction relief. Defendant assigns as error: (1) The failure to find a denial of effective assistance of counsel; and (2) a finding that his plea of guilty to second-degree murder was not obtained in violation of his constitutional rights. We affirm.

Defendant was being held in the county jail on felony charges for possession of and intent to manufacture marijuana. At the same time he was under investigation by the police concerning the recent disappearance of his wife. Defendant's mother retained Paul Galter, a Lincoln attorney, to represent her son. She told Galter her son was in custody on other felonies but was also suspected of something in connection with the disappearance of his wife. Galter, who was leaving for Colorado, assigned Arthur Langvardt, one of his associates, to handle the matter until his return.

Langvardt interviewed Hoppes at the county jail. He learned the Lincoln police had been extensively questioning Hoppes in respect to his wife's disappearance. Hoppes had been visiting with the authorities and seemed to be under considerable stress. Langvardt advised defendant not to talk any

further with anyone about any alleged crimes. Upon discussion with the county attorney's office about obtaining Hoppes' release, Langvardt learned the authorities considered him the primary suspect in his wife's disappearance. The police had discovered items at the place of his wife's employment indicating a quarrel and a struggle. The defendant had facial abrasions. He had also made some inconsistent statements to the police. This heightened their suspicions. Langvardt arranged for bond, and defendant was released from custody on January 5, 1976.

That same day defendant met with Langvardt at his office. He told Langvardt he was responsible for the death of his wife, and that he wanted to turn himself in. He also told him where the victim's body could be found. Langvardt told Hoppes he did not want to tell him what to do at that time. Langvardt then consulted with Hal Bauer, one of his senior associates, and the two of them made a telephone call to Galter in Colorado to discuss what to do next. Galter "didn't think it was a bad idea" to turn Hoppes in to the authorities "if that's what Tom wanted to do."

Langvardt advised defendant not to talk to anyone other than counsel about the matter until his attorneys could consult with one another and further investigate the possible legal strategy. Langvardt also personally investigated the area of the lake where his client had stated the body could be found. He noted the area was a shallow inlet frequented by ice fisherman. It appeared to him the discovery of Mrs. Hoppes' body was probably imminent.

The attorneys then weighed the advantages and disadvantages of the defendant coming forward and disclosing to the authorities the location of his wife's body and the implied admission of his responsibility for her death. In this respect they were convinced from defendant's story to them that his wife's death

had been accidental. They believed it might be better strategy to give the police the location of the body rather than to let them make that discovery on their own.

Bauer and Langvardt accompanied defendant to the courthouse where on the record Bauer stated they were there for the purpose of turning Hoppes in on an alleged crime. Bauer stated that Hoppes had admitted to them he was responsible for the death of his wife, and knew where the body was. Bauer further stated for the record that from what Hoppes indicated to them her death was accidental. He had not intended to cause the death. There had been an attack upon him to some degree. After the injury to Mrs. Hoppes he panicked, took her body to a lake near Lincoln, and the body was there at that time.

Bauer testified at the post conviction hearing. He related what the defendant had told them as to how his wife met her death, how he had weighted the body down with tire chains from his automobile and with a wheel or other heavy object from the car, and had pushed the body through the ice where someone had been ice fishing.

The evidence indicated Hoppes had been adamant in wanting to turn himself in. Bauer testified Langvardt brought defendant into his office because defendant wanted to turn himself in and Langvardt wanted some help in the matter. Defendant indicated he had been driving around, even out of the state, and was in a state of mental turmoil not knowing what to do. Bauer testified the lawyers concluded their responsibility was first, to advise Hoppes of his rights, and second, to handle the method in which he turned himself in, if he did that. They did not ask him to turn himself in. They did not attempt to either dissuade him or to persuade him. They advised him if the body was never found he might never be caught. Bauer suggested it weighed heavily on his mind that defendant had

weighted the body with objects from his automobile and if the body was found it would be possible to connect defendant with the body. Bauer also considered that the lake was not deep and there was a strong possibility the body would be found.

The thrust of defendant's assignment of ineffective assistance of counsel is his contention now that the attorneys should not have cooperated with him in turning himself in. He argues it was their responsibility to suggest to him the body might never be found and if so, he would never be charged with the murder. Bauer was asked this specific question: "Did you ever advise the defendant that if the body — that he should keep his mouth shut, not say anything and that if the body's never found, he could walk away from the crime?" He answered: "Yes. We discussed that. It's interesting what you're asking. We wondered about out [sic] duty to the Court at that time knowing that the Police were looking for a body, and I can say our duty to the Court was not considered in any way at all, that our decision was made strictly on the basis of what was best for him, and it was a matter of weighing the odds. On the one side of his leaving the body there, hoping that it would never be found, the odds there versus the benefits of turning himself in, and it was the decision that we decided he was better to turn himself in than to gamble that the body would never be found."

The evidence clearly indicated defendant wanted to surrender to the police, acknowledge responsibility, and put an end to his ordeal. It is evident from the record defendant's attorneys, as a matter of strategy, decided it was best for them to go along with the defendant's idea of turning himself in. By doing so, they were lending credence to a possible defense of accidental death. It would also be possible to explain the disposal of the body because defendant panicked when he discovered his wife had been accidentally killed.

Hoppes also argues he was denied his constitutional right to effective assistance of counsel because his attorneys failed to conduct an in-depth investigation of his case and failed to disclose the fact to him that the State had endorsed the name of Hal Bauer, one of his attorneys, on the information as a possible State's witness. There is no merit to this contention. The evidence clearly reflects that the defense strategy was focused not upon a possible trial but upon negotiation for a lesser charge.

From the record it appears the defendant was adamant in wanting to disclose his crime to the authorities. He instructed his lawyers to seek the least possible charge rather than investigate the evidence to prepare for trial. In this context the defendant could not possibly have feared the testimony of Bauer, one of his attorneys, even if any of it could have been admitted, since no trial was contemplated. Under such circumstances, there is no duty on the part of defense counsel to perceive an unspoken concern of the defendant about a potential witness and to advise him in connection therewith.

Of more moment in attempting to get a reduced charge was the fact defendant's lawyers were in possession of information that while Hoppes still had the body of his wife in his car he spent the night in bed with a girl friend. Galter was convinced this information was available to the prosecution. It would be very damaging evidence and would make it difficult to get the charge reduced. This fact weighed heavy in Galter's final conclusion to advise defendant to accept a plea bargain to second-degree murder, when the county attorney would not settle for manslaughter.

Hoppes' next assertion is that he was under the influence of drugs at the time of his guilty plea to the extent that he did not fully comprehend what he was doing and consequently his plea was not knowingly, intentionally, and voluntarily made. Before Judge

Fahrnbruch accepted defendant's plea, he asked Hoppes if he was under the influence of any alcohol, drugs, narcotics, or other pills. Defendant replied that he was not. The testimony of defendant on this issue therefore is severely impeached by his own earlier contradictory statement.

An examination of the entire record of the plea hearing discloses that all of Hoppes' answers were responsive and coherent without any apparent confusion. This is particularly true of the answers he gave to the court in describing the argument and subsequent assault on his wife.

The testimony of the witnesses who stood on either side of the defendant at his arraignment and plea, who had a particular interest in observing him, was that the defendant displayed no psychological or physiological symptoms of being under the influence of drugs. In addition to the prosecuting attorney and the defendant's counsel, the court reporter noted no faltering or hesitant responses by the defendant during the hearing which he recorded. The jailer having custody of the defendant testified he did not observe any drug-induced symptoms of the defendant immediately prior to or after the court hearing.

We also note the defendant included the legally-prescribed drugs, Tedral and phenobarbital, among those he stated he had consumed prior to his plea. It is significant that his medical record in jail discloses that Tedral was not provided him until 22 days after his plea, and that phenobarbital does not appear until 3 days after his plea.

The witnesses for the defendant on the drug issue were prisoners in the same jail, all of whom had felony records. The trial court weighed and determined the credibility of the witnesses. From the examination of the record as to the nature of the responses of the defendant, the crucial variance in the defendant's testimony as to whether he was under the influence of drugs at the time of his plea, as well

as the indefiniteness of the record as to the kind, quantity, and effect of drugs claimed by the defendant to have been taken previous to his plea, it is evident to us the defendant did not sustain the required burden of proof on this issue.

Defendant further alleges that counsel were ineffective in that they did not advise him of his right of appeal. Previous to the sentencing, Galter had discussed appeal possibilities. There was no discussion about appeal after the sentencing. As the trial court noted, however, the defendant was in no way prejudiced by the lack of this specific advice since the sentence was in complete conformity with the plea agreement imposed, which was the one Galter advised defendant would be imposed. Also, the sentence imposed was within the statutory limits provided for the crime of second-degree murder.

Previous to the sentencing Galter had done extensive research into the actual time Hoppes would serve in prison prior to becoming eligible for parole. He proved to the authorities and those who questioned his result that they were wrong and that his interpretation was eventually accepted as the correct one. This demonstrates the thoroughness and effectiveness of defendant's counsel in respect to the sentencing issue.

We have no hesitancy in saying that on the facts in this case the failure of Galter to discuss with the defendant a possible appeal after sentencing does not indicate ineffectiveness of counsel. Where a plea of guilty is made pursuant to a plea bargain and the sentence is in complete conformity with the plea agreement, it is not reversible error for the attorney to fail to advise the defendant of appeal possibilities.

While matters relating to sentences imposed within statutory limits do not form a basis for post conviction relief, see State v. DeLoa, 194 Neb. 270, 231 N. W. 2d 357 (1975), there is no basis apparent in the record on which this sentence would have been dis-

turbed on appeal. Further, the evidence on the voluntariness of the plea, the only other possible issue on appeal, has been determined herein. We are convinced the plea was knowingly, intentionally, and voluntarily made.

We are in full agreement with the trial court. The defendant wholly failed to prove ineffectiveness of counsel. We held in State v. Haynes, 192 Neb. 445, 222 N. W. 2d 358 (1974): "Where defendant's trial counsel performs at least as well as a lawyer with ordinary training and skill in the criminal law and conscientiously protects his client's interest, he has met the criteria of effective trial counsel." We have no hesitancy in finding that defendant's counsel adequately met this test. There was no basis in the record before us on which the trial court could have found the defendant was materially prejudiced in the way his case was handled by his counsel.

The judgment of the trial court is correct and is affirmed.

AFFIRMED.